IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTOR GUTTMANN, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>NISSIN FOODS (U.S.A.) COMPANY, INC.,<br><br>    Defendant.<br>_____ / | No. C 15-00567 WHA<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** |

### INTRODUCTION

In this putative class action involving instant noodles, defendant manufacturer moves to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6). For the reasons stated herein, defendant's motion is **GRANTED IN PART AND DENIED IN PART**.

### STATEMENT

Our plaintiff, Victor Guttmann, seeks to eradicate artificial trans-fat from food. Since 2008, Guttmann has purchased and consumed a variety of instant noodle products manufactured and sold by defendant Nissin Foods (U.S.A.) Company, Inc. Nissin's noodle products contained partially-hydrogenated oil, a food additive derived from low-cost oils. The manufacturing process for partially-hydrogenated oils produces artificial trans-fat with a chemical structure different from most naturally-occurring fat. The chemical properties of artificial trans-fat give partially-hydrogenated oil a longer shelf life as compared to other additives derived from low-cost oils (Amd. Compl. ¶¶ 10–15, 58).

Guttmann's complaint cites numerous studies that purportedly link the consumption of artificial trans-fat to increased risk of certain medical conditions such as cardiovascular heart disease, diabetes, breast, prostate, and colorectal cancer, Alzheimer's disease, and organ damage. In particular, the complaint alleges "[t]here is 'no safe level' of artificial trans fat intake" and "any incremental increase in trans fat increases risk of [cardiovascular heart disease]" (*id.* ¶¶ 16–56). The use of partially-hydrogenated oils is not required by law, and while this motion was pending, the Food and Drug Administration issued a final determination that partially-hydrogenated oils are no longer "generally recognized as safe." 80 Fed. Reg. 34650 (June 17, 2015). Pursuant to that determination, manufacturers have three years to remove partially-hydrogenated oils from their products.

Although all of Nissin's noodle products contained partially-hydrogenated oils (and listed those oils among the ingredients of those products), the nutrition-facts panel on each of the product labels included the indication "Trans Fat: 0g." Additionally, five of those products included icons on the front of the product labels that described the product as containing "0g Trans Fat" (Def.'s Request for Judicial Notice, Exhs. 1–13).[1]

FDA regulations do not require trans-fat content to be declared in the nutrition-facts panel on a product label; however, "[i]f the serving contains less than 0.5 gram[s of trans-fat], the content, when declared, shall be expressed as zero." 21 C.F.R. 101.9(c)(2)(ii).

Guttmann claims that he relied on the "0g Trans Fat" icon when purchasing the five products so labeled, because he was seeking products "that did not negatively affect blood cholesterol levels or the health of his cardiovascular system, and products made with natural, healthy ingredients." He also claims he assumed that all of Nissin's noodle products were safe

---

[1] In support of this motion, Nissin has requested judicial notice of the contents of the labels on the products referenced but not thoroughly described in Guttman's complaint. Documents that are appropriate for judicial notice may be considered on a motion to dismiss if they are referred to in the complaint and the parties do not dispute their authenticity. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). The authenticity of the product labels was established by Nissin's vice president of marketing, and Guttmann does not dispute authenticity (Chung Decl. ¶ 3). Guttmann's complaint specifically alleges that he purchased the products to which these labels were affixed within this jurisdiction (Amd. Compl. ¶ 2). Accordingly, the contents of the product labels may be considered for the purpose of adjudicating this motion.

2

to consume. Guttmann's complaint also includes a list of several products similar to Nissin's noodles that do not contain artificial trans-fat (Amd. Compl. ¶¶ 3, 76–84; Appendix B).

This is not Guttmann's first foray into litigation regarding artificial trans-fat. Guttmann has filed three prior lawsuits regarding artificial trans-fat and food labeling. *Chacanaca v. The Quaker Oats Company*, No. 10-0502 (N.D. Cal.) (Judge Richard Seeborg); *Eileen Peviani, et al. v. Hostess Brands, Inc.*, No. 10-02303 (C.D. Cal.) (Judge Consuelo Marshall); *Guttmann v. Ole Mexican Foods, Inc.*, No. 14-04845 (N.D. Cal.) (Judge Haywood Gilliam).

In February 2015, Guttmann commenced this action against Nissin and seeks to represent two nation-wide classes, the particulars of which are not yet in play (Amd. Compl. ¶ 85).

Guttmann's complaint alleges eight claims for relief: (1) the unfair prong of the California Unfair Competition Law, California Business & Professions Code Sections 17200, *et seq.*, (2) nuisance under California Civil Code Sections 3749, *et seq.*, (3) breach of the implied warranty of merchantability, (4) the unlawful prong of the California Unfair Competition Law, (5) the fraudulent prong of the California Unfair Competition Law, (6) the California False Advertising Law, California Business & Professions Code Sections 17500, *et seq.*, (7) California Consumer Legal Remedies Act, California Civil Code Sections 1750, *et seq.*, and (8) breach of the express warranty that the noodles contained 0g trans-fat. Guttmann seeks, among other things, restitution, disgorgement, punitive damages, injunctive relief, and attorney's fees.

Nissin now moves to dismiss Guttmann's complaint pursuant to Rules 12(b)(1) and 12(b)(6). This order follows full briefing and oral argument.

**ANALYSIS**

**1. GUTTMANN'S MISLABELING CLAIMS.**

With respect to the labels, which pertain to claims four through eight, federal law provides an extensive scheme governing labels on food products.

"Nutrient-content claims," which are statements about the nutrient contents of a food product outside of the nutrition-facts panel, are governed by Section 343(r) of Title 21 of the United States Code. The FDA has promulgated regulations regarding nutrient-content claims. 21 C.F.R. 101.13. An "express" nutrient-content claim, which does not implicitly characterize

3

the level of the nutrient in the food, may be included on a product label, provided "it is not false or misleading in any respect." *Id.* at 101.13(i)(3). States are expressly preempted from establishing requirements for food labeling that are inconsistent with those requirements. 21 U.S.C. 343-1(a)(1)(5).

On the other hand, "nutrition facts," which are statements about nutrient contents in the nutrition-facts panel, are governed by Section 343(q) of Title 21 of the United States Code. The FDA has also promulgated regulations regarding nutrition facts. 21 C.F.R. 101.9. Specifically, as noted above, regulation requires the use of a "rounded value" for nutrition facts relating to trans-fat content: "If the serving contains less than 0.5 gram[s of trans-fat], the content, when declared, shall be expressed as zero." 21 C.F.R. 101.9(c)(2)(ii).

Guttmann's complaint alleges five California state-law claims based on Nissin's use of the "0g Trans Fat" icon on the front of Nissin's product labels. Guttmann argues that his claims based on Nissin's labels are not preempted by federal regulation because the "0g Trans Fat" nutrient-content claim is misleading.

This precise issue was addressed in *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111 (N.D. Cal. 2010) (Judge Richard Seeborg), one of Guttmann's prior challenges to the use of artificial trans-fat in food products. There, Judge Seeborg looked to FDA comments on a separate regulatory provision regarding "reference" claims, which are nutrient-content claims that compare the contents of one product to those of another. The FDA had been asked to resolve a dispute as to whether reference claims were required to use "rounded" values or "unrounded" values and determined, "because there is no nutritional difference between rounded and unrounded values of a nutrient in a food, the agency does not see a need to specify which value should be used in determining whether or not a food qualifies to make a nutrient content claim." 58 Fed. Reg. 44020-01 at 44024 (Aug. 18, 1993). Judge Seeborg reasoned that if the FDA had decided there was "no nutritional difference" between the rounded and unrounded values in the context of reference claims, use of the unrounded value could not be misleading when used as an express nutrient-content claim. Because that label was not misleading, any state-law claim based on that label would establish requirements that were inconsistent with

4

343(r) and its regulations. Such claims were expressly preempted by Section 343-1(a)(5). So too here.

Our court of appeals reached the same conclusion in an unpublished decision, *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 475 F. Appx. 113, 115 (9th Cir. 2012). The FDA had addressed concerns that discrepancies between a nutrient-content claim on a product label and a statement in the nutrition-facts panel would be confusing to consumers. The FDA adjusted its requirements for product labels to avoid such discrepancies. 58 Fed. Reg. 44020, 44024–25 (Aug 18, 1993). To permit state-law claims based on a "0g Trans Fat" nutrient-content claim while the FDA required trans-fat to be declared as zero in the nutrition-facts panel would compel such a discrepancy, which would impose a burden relating to product labeling not identical to the requirements of federal law, which was expressly preempted. *Carrea*, 475 F. Appx. at 115–16.

The decision in *Reid v. Johnson & Johnson*, 780 F.3d 952, 962–963 (9th Cir. 2015), is not to the contrary. There, the product label at issue included a nutrient-content claim of "No Trans Fat." The state-law claims based on that nutrient-content claim were not preempted by federal law because the FDA had issued two warning letters to manufacturers stating that "No Trans Fat" and "trans fat-free" were both "unauthorized nutrient-content claims." No such letter has been issued regarding "0g Trans Fat." *Reid* does not control.

Accordingly, Guttmann's fourth through eighth claims, namely, for violations of the fraudulent and unlawful prongs of the Unfair Competition Law, the False Advertising Law, the Consumer Legal Remedies Act, and for breach of express warranty, are **DISMISSED**. Leave to amend will not be allowed due to futility.

**2. GUTTMANN'S USE CLAIMS.**

Apart from the mislabeling claims (held preempted above), Guttmann alleges that Nissin violated California law by including such a poisonous ingredient as artificial trans-fat in its noodles. This goes to use, not labeling, and is not preempted.

5

### A. Guttmann's Claim Under the Unfair Competition Law, Unfair Prong.

Guttmann argues that Nissin's use of artificial trans-fat in its noodle products constitutes an unfair business practice under California's Unfair Competition Law. Nissin contends that Guttmann's claim is preempted by federal law.

No decision has addressed whether the lawful use of a dangerous substance in a food product can constitute an unfair business practice within the context of the Unfair Competition Law. While California appellate courts are not completely settled on what constitutes an "unfair" business practice, unfairness is generally determined by either the "balancing test" or the "tethering test." *See Lozano v. AT & T Wireless Services, Inc.*, 504 F.3d 718, 736 (9th Cir. 2007). Unfairness under the balancing test "involves balancing the harm to the consumer against the utility of the defendant's practice." *Id.* at 735. Under the tethering test, "unfairness must be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Ibid.* (citing *Cel-Tech Communications v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 186–87 (1999)). "[A] practice may be deemed unfair even if not specifically proscribed by some other law." *Cel-Tech*, 20 Cal. 4th at 180.

Here, Guttmann has plausibly alleged that Nissin's conduct violates the Unfair Competition Law under the balancing test. His complaint alleges in great detail the serious harm artificial trans-fat poses to public health, including that it causes "inflammation and damage to vital organs and an increased risk of heart disease, diabetes, cancer, and death." He further alleges that the only utility in the use of partially-hydrogenated oils, as opposed to oils that do not contain artificial trans-fat, is that partially-hydrogenated oils are less expensive (Amd. Compl. ¶¶ 71, 81, Appendix B). Accordingly, Guttmann has stated a claim under the unfair prong of the Unfair Competition Law.

Nissin argues that Guttmann's claim is preempted by federal law.

> [A] plaintiff may not bring an action under the unfair competition law if some other provision bars it. That other provision must actually bar it, however, and not merely fail to allow it. In other words, courts may not use the unfair competition law to condemn actions the Legislature permits. Conversely, the Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair. Plaintiffs may not "plead around" a "safe harbor," but the safety must be more than the absence of danger.

6

*Cel-Tech*, 20 Cal. 4th at 182.  Until recently, certain partially-hydrogenated oils, namely low euric acid rapeseed oil and menhaden oil, were expressly designated "generally recognized as safe" by the FDA.  *See* 21 C.F.R. 184.1555(c)(2), 184.1472(b).  Nissin uses soybean oil and cottonseed oil and does not argue that those regulations directly apply (Def.'s Request for Judicial Notice, Exhs. 1–13).  The FDA declined to prohibit or expressly permit the use of other partially-hydrogenated oils and artificial trans-fat, until June 17, when it determined that no form of partially-hydrogenated oil was "generally recognized as safe."  80 Fed. Reg. 34650 (June 17, 2015).  The FDA's prior declination to issue a regulation pertaining to all artificial trans-fats did not establish a safe harbor protecting use of that ingredient from the reach of California law.  In fact, the California legislature has prohibited the use of artificial trans-fat in restaurants, although that statute does not apply to packaged goods.  *See* Cal. Health & Safety Code § 114377.

Guttmann has stated a plausible claim under the unfair prong of the Unfair Competition Law, and Nissin has failed to show that claim is preempted by federal law.  Accordingly, Nission's motion to dismiss that claim is **DENIED**.

### B. Guttmann's Claim for Breach Implied Warranty of Merchantibility.

In every contract for the sale of goods there is an implied warranty of merchantability that the goods are "fit for the ordinary purposes for which such goods are sold."  Cal. Com. Code § 2314(2)(c).  Guttmann argues that because Nissin's noodles contained artificial trans-fat, they were "not fit for human consumption," which is the ordinary purpose for which a food product is sold (Amd. Compl. ¶ 111).  No decision has addressed whether the use of a dangerous food additive can render a product "not fit for human consumption" for the purposes of the implied warranty of fitness under California law.

Nissin argues that Guttmann has not alleged the kind of injury that generally gives rise to a claim for breach of the implied warranty of merchantability, but that goes to standing, which this order does not address.  For the purposes of Rule 12(b)(6), Guttmann's complaint has plausibly alleged that foods containing artificial trans-fat are not fit for human consumption, due to the myriad medical conditions to which they are linked.

7

1   Nissin's best authority on point, *Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24, 28
2   (D.D.C. 2007) (Judge James Robertson), reached a similar conclusion. That decision did not
3   reach the question of whether the inclusion of artificial trans-fat in a food product could
4   constitute a breach of the implied warranty of fitness because the plaintiff therein had failed to
5   allege an injury. This order does not reach that issue.

6   Guttmann has adequately pled that Nissin's noodles were not fit for human consumption,
7   so Nissin's motion to dismiss that claim under Rule 12(b)(6) is **DENIED**.

### C. Guttmann's Public Nuisance Claim.

"Anything which is injurious to health . . . so as to interfere with the comfortable enjoyment of life or property" constitutes a nuisance under Section 3479 of the California Civil Code. A private person may maintain an action for public nuisance if the conduct at issue is "specially injurious to himself," but not otherwise. Such a special injury must be "of a character different in kind — not merely in degree — from that suffered by the general public." *Institoris v. City of Los Angeles*, 210 Cal. App. 3d 10, 20 (1989).

Guttmann argues that Nissin's use of artificial trans-fat in its noodle products interfered with the public's "right to a safe food supply" and that he has suffered a special injury in the form of alleged health risks associated with consumption of those noodles. No decision applying California law has found that interference with the general public's right to a safe food supply by selling products with unhealthy ingredients constituted a public nuisance. The only injuries to the general public alleged herein are the risk of harm due to the consumption of artificial trans-fats and the cost of purchasing Nissin's noodle products. Guttmann has not alleged that he has suffered an injury different in kind from those injuries.

Guttmann cites *Birke v. Oakwood Worldwide*, 169 Cal. App. 4th 1540, 1550 (2009), for the contention that an injury "to the health and comfort of an individual[] is in its nature special and peculiar and does not cause a damage which can properly be said to be common or public." Guttmann admits, however, that the injury contemplated in that decision was the aggravation of the plaintiff's asthma due to the alleged nuisance of second-hand smoke, which was a special injury as compared to the general public's increased risk of lung cancer. Similarly, in *Ileto v.*

*Glock, Inc.*, 349 F.3d 1191 (9th Cir. 2003), Guttmann's other authority on point, the plaintiffs had suffered mental trauma and physical injuries as direct victims of gun violence. The plaintiffs were permitted to bring a nuisance claim based on the defendant's alleged recklessness in the distribution and sale of firearms, because their injury was different in kind from the injury of danger and fear suffered by the general public.

There is no allegation that Guttmann suffered a specific personal injury that is different in kind from the increased risk of harm allegedly suffered by all consumers of Nissin's noodles. Accordingly, Guttmann's public nuisance claim is **DISMISSED**.

### 3. STANDING.

Nissin has also argued that Guttmann lacks standing under Article III and the Unfair Competition Law. The Court has ordered limited discovery as to the dates and quantities of Nissin's noodles that Guttmann purchased and consumed, the extent to which he was aware that FDA regulation required trans-fat content less than 0.5 grams per serving to be declared as zero in the nutrition-facts panel, and the extent to which he has been medically diagnosed with any of the conditions that the complaint alleges are caused by the consumption of artificial trans-fat (Dkt. No. 50). That issue will be held in abeyance pending the results of that limited discovery.

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss is **GRANTED IN PART AND DENIED IN PART**. Guttmann's claims for violation of the unfair prong of the Unfair Competition Law and breach of the implied warranty of merchantability survive; all other claims are dismissed without leave to amend.

**IT IS SO ORDERED.**

Dated: July 15, 2015.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

9